[No. 20130.   Department Two.   March 16, 1927.]

C. F. FORQUER, *Appellant*, v. INLAND FINANCE
COMPANY, *Respondent*.[1]

[1] CORPORATIONS (216, 218, 221)—INSOLVENCY AND RECEIVERS—AP-
POINTMENT OF RECEIVER—MALADMINISTRATION—PROOF. A receiver
of a corporation should not be appointed at the suit of a small
stockholder, because of an unfair distribution of the voting
powers of stockholders, at all times known to the plaintiff, nor
because the control was lodged in the hands of stockholders
holding less than half of the investment, nor for past frauds
committed, where the company, though in a precarious con-
dition, was far from insolvency, and was not at present being
fraudulently conducted or seriously mismanaged, and a receiver-
ship was not likely to better the conditions.

Appeal from a judgment of the superior court for
Spokane county, Lindsley, J., entered May 5, 1926,
upon granting a nonsuit, dismissing an action for the
appointment of a receiver, tried on the merits to the
court.   Affirmed.

*Alex M. Winston*, for appellant.

*G. M. Ferris*, for respondent.

BRIDGES, J.—The purpose of this action is to have a
receiver appointed over the property and affairs of
the defendant. At the close of the plaintiff's testimony
the court granted a nonsuit, and a judgment was en-
tered dismissing the suit.

The respondent corporation was formed in the fol-
lowing manner: One Mr. Listman, of Seattle, who was
the head of the Listman Service Company, came to
Spokane some years ago, and calling about him a few
individuals (who are for the most part those who are
now in the control of the affairs of the company), ex-
plained to them his idea of forming a corporation and

[1]Reported in 253 Pac. 1086.

the manner of the performance of its duties. The plan was to form a corporation under the laws of the state of Washington with a capital stock of $810,000, divided into 21,000 shares of various kinds of stock. There were to be 5,000 shares of preferred stock at one hundred dollars a share, equaling $500,000; 6,000 shares of first common stock at fifty dollars a share, equaling $300,000; and 10,000 shares of second common stock at one dollar a share, equaling $10,000. This preferred stock was to be sold to the general public upon the terms and in the manner later recited. It was to be entitled to cumulative dividends at the rate of seven per cent per annum, and was to be thus preferred over all other stock. If there was any money left after paying the above, then the first common stock was entitled to like dividends, and following that the second common stock was to have its like dividends, if there was sufficient money. The corporation was to have its principal place of business at Spokane and was to have very wide and extensive powers, but its chief business would be to purchase and otherwise acquire, sell and otherwise deal in automobiles, tractors, trucks, and other motor propelled vehicles, and particularly to finance dealers in such vehicles in the purchase of the same from factories and in selling to retail purchasers.

Apparently, a tentative agreement having been reached between those present, Mr. Listman and one of his associates executed and filed articles of incorporation. These fixed the capital stock and the shares as we have above indicated, and were in other respects in the usual form. By-laws were adopted, fixing the number of trustees and providing that at all meetings of the stockholders "each record stockholder shall be entitled to cast one vote for each share of stock shown by the record to be owned by him." At a meeting of

the board of trustees, officers were elected and a stock selling contract was entered into between the respondent and the Listman Service Company. It gives the Service Company the exclusive right to sell the whole of the 5,000 shares of preferred stock at one hundred and twenty-five dollars per share, or twenty-five dollars above par, and each purchaser of a preferred share should be given as a bonus a certain amount of the first common stock. This was so divided as that, when all of the preferred stock was sold, all of the first common stock would have been given away. The Service Company, for its services, was to receive twenty-five dollars for each share of preferred stock sold, thus leaving to the respondent one hundred dollars per share; and, in addition thereto, the Service Company was to be given shares of second common stock as follows: On the first 1,000 shares of preferred stock sold, three shares of the second common stock for each share of preferred stock sold; for the succeeding 2,000 shares of preferred stock, two shares of the second common stock; and for the next 2,000 shares of preferred stock, one share of the second common stock. Under this contract, the Service Company sold most or all of the preferred stock, but evidently some of it was not paid for in full, so that there ultimately came into the hands of the respondent from the sale of stock a little more than $400,000. Of the 10,000 shares of second common stock, the Service Company obtained something like 9,000 shares, and the remainder was given, for the most part, to the members of the board of trustees for their services. The record is not very clear as to just how many shares of preferred and first common stock are now outstanding, but it would seem that nearly all of the second common stock is now in the hands of Mr. Listman and the

present officers and trustees of the company. It would appear that Mr. Listman had previously organized a similar company known as the United Finance Company, with its principal place of business in Seattle, which later comes into the picture.

So equipped, the respondent at once launched into an extensive business. It gave financial backing to several large companies in Spokane which were buying automobiles from various factories and selling them at retail. As these companies would get their autos from the factory, being unable to finance themselves, they obtained the money from the respondent, which was given chattel mortgages on the cars thus purchased. And as these companies sold the cars, the respondent would purchase the sales contracts. It was not long, however, before the respondent commenced buying the paper and securities of the United Finance Company, of Seattle, and from time to time, in 1920, 1921 and 1922, purchased from that company its paper and securities, paying therefor large sums of money. Generally speaking, the United Finance Company endorsed or guaranteed the payment of this paper, or at any rate in some manner stood behind it. It is but fair to say that, at that time, that company was a going concern, doing an extensive business and paying dividends.

Along about 1923 or 1924, most of the various Spokane dealers with which respondent did business became bankrupt, and the respondent had to take over the automobiles which were covered by its mortgages. These they were unable to sell at retail, and finally made arrangements whereby they were exchanged for certain real estate in Spokane, which the company still owns. A part of the real estate so obtained was heavily encumbered by pre-existing mortgages, and was taken

subject thereto.   About the same time, the United Finance Company, of Seattle, got into financial trouble and later became insolvent.   This situation forced the respondent to look to the securities which it had bought from that company which stood it large sums. In this way it ultimately became the owner of a fish cannery in Alaska, an automobile factory in Michigan, and other real estate, notes and securities.   It seems to have filed with the receiver of the defunct United Finance Company a claim for $375,000.

After respondent got these various properties by mortgage foreclosure or otherwise, it proceeded to put them in the best shape it could.   It now has a contract for the sale of the cannery and the Michigan property, these two items constituting a large portion of the moneys advanced to the United Finance Company. These contracts are more or less precarious, but may work out.   The Spokane real estate is being rented and carries itself.   Although the respondent is desirous of selling that property, it has not yet been able to do so. It would seem that there will be quite a heavy loss in this respect.   In addition to the properties mentioned, the respondent has quite a large number of small notes and securities, some of which are relatively new and appear to be good and will be paid, and some of which are past due and are questionable.

The foregoing is as brief a statement as we can make of respondent's present condition.

The appellant says that the respondent is reeking with fraud, that it was created in iniquity, that it was organized for the benefit of Listman who has caused it to be operated in his behalf, that it is so organized and has been so developed as that, in substance, the minority control the majority; and that, if a receiver is not appointed such of the assets as the company now

has will be frittered away and nothing be left. There would seem to be some truth in appellant's charge. For illustration, under the by-laws, the 10,000 shares at one dollar a share, now held by Listman and the officers of respondent, can control any stockholders' meeting and can practically out vote the owners of all the preferred and first common stock. In other words, stock of the par value of $10,000 can out vote stock of the par value of $800,000. Under these circumstances, the people who actually put up the large sums of money to capitalize the respondent have very little to say concerning its affairs, provided the owners of the second common stock take advantage of the strong position in which they are. Whether under our statute and the law generally a share of stock of the par value of one dollar has the same power of control as the share of stock of the par value of one hundred dollars, we do not here decide. We will do nothing more than call attention to our statute. Rem. Comp. Stat., § 3812 [P. C. § 4516], provides that "each stockholder . . . shall be entitled to as many votes as he may own, or represent by proxy, shares of stock . . ." and that a corporation may provide that its preferred stock "shall have no voting power. . ."

[1] If Mr. Listman has heretofore controlled the company and its officers, as is claimed by appellant, and if there has been fraud, mismanagement, or bad judgment, it must be remembered that those are things of the past and cannot be remedied by the appointment of a receiver. Regardless of the cause or causes, the company is in its present financial plight, and we cannot undo what has been done. The appellant is but a very small stockholder. He is not even a creditor, for as such he would be in a stronger position to ask for a receiver than merely as a stockholder. Nor does he

seek rescission for fraud or misrepresentations. He only asks that a receiver be appointed. The articles of incorporation and the by-laws plainly show the character of the organization, and those who became stockholders had an opportunity, of course, to know the structure of the concern in which they were investing. In cases of this kind we must look more to the future than to the past.

We find that the $400,000 which the company originally had is now for the most part in properties of uncertain value. By nursing these assets along, there is a chance that ultimately very considerable values may be obtained and much saved for the stockholders. There is also a chance for a heavy loss. But we must accept the situation as it is now. The corporation is far from being insolvent. Its debts are very small. The present officers seem to be doing about all that can reasonably be done under the present state of affairs. We do not see what a receiver could do more than they. Indeed, a receivership would be much more expensive, and because of the manner in which he would be required to handle the assets it is likely that he would not get as much out of them as the present officers can obtain. Whatever may have been done in the past, we cannot see from the testimony that the affairs of the company are now being either fraudulently conducted or seriously mismanaged. We would be willing to exercise our equitable powers and appoint a receiver, if we were convinced that that was the wise thing to do, but we are not so convinced. The trial court was about right when he said that "as much has been lost as can be lost."

But it is said that the power vested in the second common stock is being used to keep in office those who are now in charge and to furnish them good salaries

for small services. But we think the situation is not so bad as the charge would indicate. If these assets are properly looked after, considerable work is necessary. The salary of $175 per month to each the president and secretary would not seem to be very extravagant.

Viewing the situation as it now is, we do not see that the appointment of a receiver would better conditions materially, and for that reason the judgment is affirmed.

MACKINTOSH, C. J., ASKREN, and MITCHELL, JJ., concur.